# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00533-CV

---

**M. B. and O. R., Jr., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY**
**NO. 19-0094-CPSC1, THE HONORABLE BRANDY HALLFORD, JUDGE PRESIDING**

---

## MEMORANDUM OPINION

The trial court signed an order terminating the parental rights of appellants M.B. (Mother) and O.R., Jr. (Father).[1] Mother has four children—son D.R., born in October 2008; son O.R., born in June 2010; daughter Z.R., born in March 2013; and son L.P., born in November 2015—and Father is the father of the older three children.[2] After no one picked up the children from school on September 19, 2019, the Texas Department of Family and Protective Services filed its original petition seeking custody. After a final hearing held a year later via video conference due to COVID-19, the trial court signed its order, finding that termination of the parents' rights was in the children's best interest and that the parents had engaged in conduct that

---

[1] For the children's privacy and for clarity, we refer to the parents as "Mother" and "Father" and to the children and others involved by their initials. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

[2] The parental rights of L.P.'s father were also terminated, but he did not appeal.

amounted to at least one statutory ground for termination.[3] *See* Tex. Fam. Code § 161.001(b)(1), (2). Both Mother and Father appealed, and Father's appointed attorney has filed a brief concluding that the appeal is frivolous and without merit. *See Anders v. California*, 386 U.S. 738, 744 (1967). We affirm the trial court's order of termination.

## SUMMARY OF THE EVIDENCE

At the final hearing, the trial court heard testimony by Mother, Father, three Department employees, the children's two court-appointed special advocates (CASA), Father's mother (Grandmother), and the principal and the counselor at the three older children's elementary school. The school counselor testified that Mother called at about 3:30 p.m. on September 19, 2019, to say she "was on the bus to come get" the children. She then told the counselor that she needed help with her electricity, "that the electricity was cut off," that the counselor should "call the dad because she needed help with the kids," and that Mother wanted to see if someone "could force him to take custody of the kids." The counselor testified that she only had known Mother for "a week or two" at the time and that in that span, they had had three earlier conversations—in the first, Mother "seemed very upset and overwhelmed"; in the second, she "seemed very put together and very nice and pleasant"; and in the third, she "seemed very upset," said she had a rat problem at her apartment and asked the school to contact her landlord, and "demanded" that the school help because she was going to be evicted. The counselor agreed that Mother's moods "varied greatly" through those conversations, which caused some concern, and said Mother would "cuss," "get loud," and accuse the counselor of not taking Mother seriously or not understanding what Mother was asking.

---

[3] *See* Second Amended Emergency Order Regarding COVID-19, Travis County Civil & Family Courts, Admin. File No. GN-61-121012, signed and filed May 7, 2020.

The school principal testified that the three older children did not have excessive absences from school but were "untidy" and "disheveled." She also said the children received special support from the school but that Mother did not seem interested in how the children were doing academically. Most of the conversations with Mother involved "transportation challenges," and Mother called "[a] lot" and would get "pretty upset" and "very agitated." The principal explained that the children rode a "special education bus" and that someone had to meet them at the bus stop. On the afternoon in question, no one was there to meet the children, so the bus driver returned them to campus. The school started calling the children's emergency contacts and called the police when they were unable to reach anyone by 5:00 p.m.

Department investigator Shannon Reynolds testified that at about 6:00 p.m. on September 19, the Department received a report that no one had picked up the older three children and that the police had brought the children to the police station and tried unsuccessfully for several hours to reach the parents or the emergency contacts. The children were moved to the Department's offices, and further efforts were made to reach the parents and the emergency contacts. When Reynolds finally contacted Father at about 8:00 p.m., he said he "was headed to the office" from the Pflugerville area. Father was cooperative until Reynolds mentioned having him drug tested, at which point he "kind of seemed hesitant."

Department caseworker LeTasha Allen testified about her phone calls with Father after that initial call with Reynolds. Allen called at 8:40 p.m. to ask where he was, and Father "seemed very frustrated and very short and he slurred his words a little bit" and said he was in Pflugerville waiting for his mother to drive him to get the children. At about 9:30 p.m., Father said he was on I-35 and going to pick up his mother. At 10:13 p.m., however, Father said that "he was on 7th Street in downtown Austin" and, when asked why he was there and cautioned

that he was at risk of losing custody, he "became angry and said, 'I got it. I got it. I'm on my way.'" About fifteen minutes later, Allen called "to find out if he had at least got on the road to head towards meeting with his children. And he said that he was still on 7th Street and was not on his way." At that point, the Department moved to take custody of the children.

At about 10:30 p.m., Mother returned Reynolds's call and said she was at a bus stop in south Austin and trying to find a ride back to Round Rock. Reynolds said that she asked where Mother wanted to meet and that Mother said she "preferred to have her mom bring her to the [Department's] office." Reynolds testified that after Mother arrived between midnight and 1:00 a.m., she asked the Department to take custody of all four children "because she couldn't provide for them." Reynolds further testified that the Department "initially tried to give her resources," such as offering assistance with utilities, but that Mother "stated she just preferred to give us custody at the time." Finally, Reynolds stated that Mother talked "about the conditions of her home, that there were rats, bedbugs, kids didn't have food, and she didn't want them sitting in the dark starving. So she requested that we take them to keep them safe."

Allen observed that although Mother said "she had concerns that both of the fathers of her children were using drugs currently," she had asked Father to pick up the children. Mother told Allen that she had told the school's counselor "that she was having hard times" and that "if [Father] didn't show up, that they needed to contact CPS." Mother also told Allen that her home was "infested with rats and with bedbugs," that she had had to throw away all but one twin-size mattress, that the residence had no electricity, that she "was sitting up at night trying to make sure the rats didn't crawl on the children while they were sleeping," that she "didn't have any food in the home for the children," and that "the dead rodent smells in the walls was causing [D.R.]'s asthma to start flaring up." Allen spoke to Mother for at least an hour, trying to figure

4

out if someone could take in the family to allow Mother to get on her feet, but Mother said no one could or would help. Allen asked if Mother was sure she wanted the Department to take custody, explaining "that it could be a year of her working services before she could get them back, and she said, yes, that is what she wanted."

Allen testified that Mother had endangered the children (1) because their living conditions "were not appropriate," and (2) by failing to pick them up without having made "appropriate arrangements," agreeing when asked if such instability endangers the children. She also noted that by allowing Father to pick up and care for the children despite "concerns about drug use," Mother placed them with someone whose conduct endangered their well-being.

Allen testified that concerns about Mother's mental health arose during the pendency of the proceeding. Allen testified that she drove Mother to a drug test and several visitations because another Department employee "did not feel comfortable," explaining that Mother would tell Allen "that she had contacted the FBI and filed a complaint against" her and talked about "a conspiracy theory" in which "helicopters were searching and finding people that were getting hit with the cars, and they were selling organs, and it was happening all over Austin. And sometimes just things didn't necessarily make sense." Allen testified that both Father and L.P.'s father expressed concerns about Mother's mental health.

Caseworker Deanna Davis took over the case in February 2020. She testified that Mother "is often not only argumentative but belligerent, accusatory, disrespectful. But in a way that appears threatening," sometimes physically. She further said Mother was "openly hostile" and screamed at Davis; made Davis fear for her own safety "[s]everal times"; told Davis that she was going to file charges with the FBI that would result in Davis being incarcerated; and sent "countless emails and texts in all caps using profanity" telling Davis what to do about the

5

children and their placements. Davis testified that "there has not been an interaction that I know of from the previous caseworker and myself where it hasn't erupted into a more explosive situation where, no matter what we try to say to her, she becomes more and more angry." In addition, Mother made threats on social media toward D.R. and Z.R.'s foster parents and called the police to ask them to conduct what Davis characterized as an unwarranted welfare check, explaining that the Department had investigated and ruled out Mother's allegations.

Mother's service plan, of which the trial court took judicial notice, required her to complete a psychological evaluation and engage in individual therapy. She was also required to sign the Department's visitation contract, which sets out the rules governing a parent's visitation. In February 2020, the trial court suspended Mother's visitations until she signed the visitation contract and engaged in mental health services, and Davis testified that she made several referrals and offered weekly to assist Mother with those services but that Mother continued to refuse because "she didn't need those services" and "didn't have to" sign the contract. In addition, Davis testified that the only address Mother had provided was for a hotel in Austin; that she never gave Davis a room number and responded that Davis "already knew where she was" when asked for one; that she did not notify the Department when she moved; that she failed to provide any proof of employment and would not tell Davis exactly where she worked; and that she "has refused all services" offered by Davis. Davis further said that the Department had concerns about Mother's mental health because she: "had a very agitated and erratic behavior that could be perceived as threatening"; "would often indicate that she was going to pursue charges against pretty much everyone involved in the case through the federal government, the FBI, the CIA, as well as reporting things to local law enforcement"; and often made accusations against Davis and other Department personnel.

Davis agreed that Mother's visitations had been appropriate before Davis was assigned to the case, admitted that she and Mother had not "had the most positive relationship," and expressed regret that she told Mother that Davis "would be running the show, not [Mother]." Davis further agreed that Mother "has been very vocal from the beginning of this case that she doesn't believe she needs services"; that Mother has faced "significant transportation issues"; that there was no evidence of physical abuse, excessive absences from school, or medical neglect; that there was no indication that Mother was abusing drugs around the children or allowing Father to do so; and that although the only services indicated by the initial intake were assistance with finding secure housing "and maybe some economic help," the Department had imposed additional requirements like "drug testing, psychological evaluation, [and] counseling." However, Davis testified, the Department had received numerous reports over "many, many years," most of which were closed without further action, and that history—which included at least one other report of a child not being picked up from school—when coupled with the current case, indicated a pattern of issues regarding supervision and the "home environment." Davis opined that Mother's mental health poses a risk to the children "[b]ecause her behavior is so explosive and erratic" and she "has displayed her extreme anger" in front of them. Mother's on-going assertions that "the FBI is watching" also raise concerns about her mental health and ability to be a safe parent. Davis said Mother had the opportunity to be "more present in her children's life through visitation" but continued to refuse to sign the visitation agreement or engage in mental-health services.

At the time of the hearing, the children were in three separate placements, where they had been since November 2019. Davis agreed that the children are bonded to each other and that it "could be detrimental to them if they are not all together in the same household" and

said that the Department was working to reunite the siblings in one home. In the meantime, the placements were working together to maintain the siblings' relationships, meeting at parks, having sleepovers, and taking trips together. D.R. and Z.R. were placed together in Round Rock with one of O.R.'s previous teachers; O.R. was with one of D.R.'s former teachers in Pflugerville; and L.P. was in a foster home in Manor. The Department was also considering Grandmother as a placement for the children. Grandmother's home study was initially denied because Father was still living there and Grandmother's husband did not want to have the children placed there, but at the time of the hearing, Father was incarcerated and Grandmother's husband had changed his mind and was willing to have the children live with them.

Davis testified that D.R. and Z.R.'s current placement is "wonderful" and stable; that the foster parents "are caring, nurturing, protective, active people that care very much for the children"; that the children are well cared for both physically and emotionally; and that the children are "very comfortable" sharing their thoughts and emotions with the caregivers. When the case began, D.R. "was overweight with significant issues with asthma," and Mother told the Department that he was autistic. Davis said, however, that D.R.—who had not been tested for autism until coming into the Department's care—had been diagnosed with an intellectual disability rather than autism. Since being placed with his foster family, Davis testified, D.R. has "slimmed down," is more active, eats healthfully, and is doing better with his asthma. Davis stated that D.R. is "[v]ery happy" and "probably healthier than he's been in a long time," and that Z.R., who has been diagnosed with an intellectual disability and a speech delay, has shown improvement since starting speech therapy in June 2020. Davis testified that O.R. is "well cared for physically and emotionally," that he is doing well in school, that the family is "very active" and does "lots of activities together," and that the caregiver makes sure that O.R. continues his

8

therapy and meets his emotional needs. O.R. had several teeth "in poor condition" when he came into the Department's care and has had oral surgery to address those issues. He "battles with being underweight" but has gained weight and "is going in the right direction." L.P.'s foster home is stable, and he is happy, healthy, and "very, very well bonded to his caregiver." He had recently started elementary school and "absolutely loves it and is excelling."

Davis agreed that the children loved and were bonded with Mother but testified that Mother had not improved her circumstances or demonstrated an ability or willingness to make positive changes or to provide for her children through the pendency of the case. Davis said Father had attempted to comply with his service plan but continued to use drugs and had not demonstrated an ability to provide a safe, stable home for the children. She testified that it was in the children's best interest for the parents' rights to be terminated.

Angela and James Fett are the children's co-CASAs. Angela testified that she had seen positive change in the children over the past year. She described D.R. and Z.R.'s home as "[v]ery nurturing, very patient with the children, setting very good examples, discipline, structure, which the children have just thrived on." D.R. was happy, outgoing, and "very loving" toward his foster parents and his sister, and Z.R. was also doing well. Their foster parents have addressed the children's therapy needs and have made sure the children know they can speak to the foster parents "about any issue." Both children have "lost a considerable amount of weight" after being overweight when they came into the Department's care, and Angela said they had "blossom[ed]" and "grown into such fantastic children." Angela said O.R. and L.P. had grown in their respective placements, were well-bonded to their caregivers, and were engaged in therapy. The children have good relationships with each other, and Angela regularly checks to be sure the siblings were having visits together.

9

Angela testified that she had seen Mother be aggressive toward other people in the presence of the children and that Mother had sent threatening or harassing texts to D.R. and Z.R.'s foster parents; called the police to request unnecessary welfare checks; and made Facebook posts "making insinuations" and listing the foster parents' names and "where they worked, their telephone number, their address." Angela believed that termination was in the children's best interest because they "have found a peace and calmness" and are thriving and getting educational help, guidance, and nurturing "to help them develop."

James agreed that the placements were meeting the children's needs and that the children have improved while in foster care, noting that D.R.'s and O.R.'s previously undiagnosed dental issues had been addressed. James said Mother had shown threatening or harassing behavior, "rang[ing] from spurious contact with law enforcement regarding welfare checks all the way through to posting about how her and her hit man were going to go after particular placements." James explained that Mother had texted that if one of the placements "did not allow a visit in defiance of the court order that she would contact law enforcement for a welfare check," and then called the police for a welfare check two or three days later, after that demand was not met. He testified that Mother "seemingly puts her needs exclusively above those of her children" and "insists that she doesn't need services" yet is "very reliant on third parties to help provide for the children, whether it would be a shelter feeding them or the school district providing transportation for them." He believed termination is in the children's best interests because they are "healthier now" and getting therapy to address their needs.

Mother testified that she kept up with the children's medical needs and that doctors had told her that the children were healthy. She insisted that dental records proved the children's teeth were "fine" when they came into the Department's care but admitted she had not

10

provided those records to the Department. Mother agreed that she knew about Father's criminal history, drug use, and history of domestic violence when they were in a relationship. She testified that there were instances of domestic violence between her and Father and said she pressed charges for an assault that occurred shortly after D.R. was born. She also knew L.P.'s father used drugs but never witnessed it. Mother was arrested twice for assault family violence in 2002 and 2003—one charge was dismissed after she underwent counseling.

Mother testified that the night the children were removed, she had L.P. and "got lost on the bus," explaining that she was still learning the bus routes and had gotten on the wrong bus going "the other direction." She said that she called the school to explain and called Father, who said he would get the children, and that she "thought that maybe his mom would take him to get the kids." Mother testified that her phone died while she was on the bus and that she could not contact anyone until about 7:00 p.m., after she was able to charge her phone. Mother assumed that the children were with Father and testified that the Department did not call her or leave "a message or anything," and so she was confused when her mother called her at about midnight to say the children were in the Department's care. Mother said that she "immediately" called the Department and got ready to go to the children but that because her mother took "a while" to pick her up, she did not arrive until "very late."

Mother denied telling anyone that she could no longer care for the children or that their living conditions were unstable or unsanitary. She insisted that she had electricity, food, and enough beds for everyone and that she had been in the process of finding a new place to live. Mother testified that she moved out of her apartment and into a hotel in February 2020 but at the time of the hearing, had been living in a shelter for women and children for about two weeks. She said she did not know when she moved out of the hotel, where she lived between the hotel

11

and the shelter, or whether she lived with someone else. Mother testified that she had asked for assistance with deposits or paying bills but that the Department "just denied the services." Mother testified that shortly after the children were removed, she found a job through a temp agency. She said she did not know how long she kept her job with the agency, how long she had been unemployed at the time of the hearing, where she had applied for work, or whether she had filled out any applications since the case began and answered, "It doesn't matter," when asked what kind of employment she had sought. Mother also said she did not know the last time she had spoken to her caseworker. Asked whether she knew she was required to keep her caseworker informed of changes in employment, address, or contact information, Mother answered, "No. But she's been knowing where I was. She's been knowing the whole time, like, [in]vading my privacy. She knows where I'm at."

Mother agreed that she never did the psychological evaluation as required by her service plan and court orders because:

> I have the right not to. Because they were already saying that I had a mental disability. And that was defamation of my character, and I don't appreciate it. They were lying on me, so that's why. They were already saying I had something going on with me without having accurate information or proof. That's defamation of my character. That's why. And because I don't trust them because they have been altering and lying. That's why.

Mother did not participate in therapy and sought advice from her pastors instead. She acknowledged that the order mandated therapy but said that the trial court had said, "'I encourage you to take it, [Mother],' meaning I have an option if I want to or not."

Mother asserted that she did not know she had been ordered to take a parenting class until "[Davis] came along" and "after she retaliated against" Mother. Asked why she did

12

not complete the class, she said, "I'm not a bad parent. That's why." When Mother was asked about an incident in which she had yelled at a delivery person in front of the children, causing the children to cry, she blamed it on the Department because the children were supposed to be "in the back" and should not have heard her altercation. Mother said that she had good visits with her children before Davis was assigned and that she had not seen the children since February 2020 because the Department "wanted me to sign a contract that I felt like I didn't have to. I shouldn't have to sign one. I never did anything to my kids." She refused to sign the visitation rules "[b]ecause I don't have to" and said, "I do want to see my kids, but I don't feel like I have to be forced to sign a contract to see my kids when I did nothing wrong to my kids."

Mother said that when the children were removed, she recommended that they be placed with Father because she thought they would live with him at Grandmother's house. Mother said, "I trust his mom," and said she thought the children would be safe with Father "as she's there. If the mom is there." Mother expressed concerns that the children were in different placements because the children "are used to being around each other" and "have always been with each other." Mother said D.R. and Z.R.'s foster parents had been uncooperative with her but denied that she had threatened those foster parents. The Department asked Mother about statements she had made on her Facebook page about the foster parents, introducing into evidence screen shots of several posts. In one, Mother posted the foster mother's name and phone number and alleged that the foster parents had injured D.R., were forcing the children "to worship a certain religious belief," and had not taken Z.R. to a doctor for medical attention. In another, Mother named the foster parents and said, "DON'T SLEEP IM UR WORST NIGHTMARE," and, "U WILL PAY FOR HURTING MY MFN KIDS." In other posts, she said that the foster parents were "ABT TO GET WHATS COMING TO THEM," that "I DO

13

NOT TRUST THEM MFS," and that "I WILL KILL U OVER MY MFN KIDS." Mother said, "I can post what I want on my page. It's my page. It's freedom of speech. I don't know what you are talking about." Asked whether she remembered being ordered in May 2020 not to mention the foster parents on social media, Mother first said that she had the right to write what she wanted, then said she did not recall the order, and finally said, "[B]ut, hey, it is what it is." The Department then introduced into evidence a post from June 2020 in which Mother again named the foster mother and said she had "BETTER GET MY DAUGHTER [Z.R.] TO THE HOSPITAL FOR THAT HIGH ASS FEVER SHE BEEN HAVING THAT U DIDN'T TELL CPS ABT."

Mother was asked about her plans if the children were returned and said that the women's shelter can accommodate children and was helping her find a place to live. She also said she would support the children "[t]he same way I have been supporting them before you-all stole them from me."[4] She explained that they would eat at the shelter and that she will apply for food stamps. She also said she could keep them at the same school in Round Rock because the school would arrange transportation between it and the shelter in Austin. Mother testified that her separation from the children has been detrimental to their well-being because:

> They know their mom loves them, and the way the Department did this, they are making my children feel like their mom doesn't love them. They are making them feel like I just up and left them. They don't have any idea of why I can't see them other than thinking I did something wrong.

Father testified that he was currently incarcerated and that he struggles with PCP use. Father's criminal history dates to 2002 and includes convictions for assault family violence,

---

[4] The Department's attorney objected to that response as nonresponsive, and the trial court sustained the objection.

manufactured delivery of a substance less than a gram, drug possession, and theft. At the time of the hearing, he was charged with aggravated assault with a deadly weapon, terroristic threat, and criminal mischief and was unsure whether he also had a charge for possession of a controlled substance. Father had a fast-food job until "a month or two" before the hearing. He then had hoped to attend truck-driving school—and had even gotten a grant for the tuition—but decided he could not attend because of his drug use. For about two weeks, he had a delivery job, and when he lost that job, his parents kicked him out of their house. Father went to stay with a friend and said "[e]verything just spiraled out of control," ending with his incarceration.

Father testified that on the night the children were taken into Department care, he had tried unsuccessfully to find a ride because his mother was sleeping and he was "on the eastside somewhere" in Austin. He denied using drugs that night and said he "was just stuck" and could not find a ride to get to the children. Father testified that he thought he had met the requirements of his service plan except for two drug tests he missed because of work. Father had attended Narcotics Anonymous meetings and sought advice and support from his pastor, a licensed chemical abuse counselor. However, Father admitted that he continued to use PCP, although he insisted that he did not use it often and that he "didn't have a problem like that," saying he last used it two months before he "got here." Father said that he had planned to check into a drug rehabilitation program after he left his job but that, "as you can see, I didn't make it." Father said his goals were to be "a successful person in life," stay sober, and take care of his children. He needed to first address his pending criminal charges, then find and keep a steady job and provide for the children. Father said Mother was a good parent who had largely raised the children on her own; denied telling a psychologist that Mother was dominant, controlling, or greedy; and said that the psychologist who reported otherwise was "[p]retty much" lying.

15

Grandmother testified that she is willing to take all four children into her home and that her husband was now in agreement that the children should live with them. She testified that she would "be protective of them against" Mother and Father, who Grandmother said "needs to go to a treatment center" to get help for his drug addiction. Grandmother talked about the children's needs and her plans for their care. Grandmother was asked why she used the word "[u]nfortunately" in talking about a call she had with Mother, and she said, "I'm quite sure everybody has experienced interaction with [Mother]. And she can misconstrue conversations, and so that's why I said 'unfortunately.'" Grandmother also said, "I just don't trust [Mother]," and, "I don't believe [Mother] has the mothering skills. She is not patient. She does a lot of yelling and screaming, and you know and I know kids don't need that."

## STANDARD OF REVIEW

To terminate a parent's rights to their child, the Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for termination pursuant to section 161.001 and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). We defer to the decisions of the factfinder, which, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *A.C.*, 560 S.W.3d at 630. In reviewing legal sufficiency, we do not ignore undisputed evidence contrary to

16

the finding but otherwise assume the factfinder resolved disputed facts in favor of its finding. *Id*. at 630-31. In reviewing factual sufficiency, we weigh the disputed evidence contrary to the finding against all the evidence favoring the finding and ask whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.*

We consider a trial court's finding on best interest in light of the factors set out in *Holley v. Adams*: the child's wishes, if appropriate given the child's age; her emotional and physical needs now and in the future; present and future emotional or physical danger posed to the child; the parenting skills of those seeking custody; any programs available to assist those seeking custody to promote the child's best interest; plans for the child's future; the stability of the home or proposed placement; conduct by the parent that might show that the parent-child relationship is inappropriate; and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

## MOTHER'S APPELLATE ISSUES

As grounds for termination, the court found that Mother (1) had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being and (2) had not complied with the provisions of a court order that established the actions necessary for the parents to regain custody of the children, who were in the Department's care for at least nine months after being removed for abuse or neglect. *See* Tex. Fam. Code § 161.001(b)(1)(E), (O).

17

Mother argues that the evidence is insufficient to support the trial court's findings of statutory grounds and its finding that termination of her rights was in the children's best interest. We will begin with the court's finding under subsection (E), which allows for termination of the parent-child relationship if clear and convincing evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id*. § 161.001(b)(E). The Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Subsection (E) focuses on the parent's conduct and asks whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *See V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.).

Mother argues that the evidence established only that she got lost on the bus, asked Father to pick up the children, and was unaware that he never arrived at the school. She asserts that her inability to pick up the children was related to the fact that she is economically disadvantaged, which, as she observes, cannot be the basis for the termination of parental rights. *See* Tex. Fam. Code § 161.001(c)(2).

However, the evidence was not simply that the children were left at school after Mother got lost on the bus. After getting on the wrong bus and riding into south Austin instead of going north to the school in Round Rock, Mother called Father, despite her concerns that he was using drugs, rather than her mother or Grandmother, although Mother seemed to have assumed that Grandmother would drive with Father. Allen and Reynolds testified that when Mother finally arrived sometime after midnight, she told them she could not care for the

children, she wanted the Department to take custody of them, she lacked electricity, and she did not have sufficient food or furniture for the children. Mother also told them that the home was infested by bed bugs to such a degree that she had to throw away most of the family's mattresses and by rats to such a degree that D.R.'s asthma was worsening. The school counselor had concerns based on Mother's fluctuating moods and because she seemed overwhelmed and indicated an inability to care for the children on her own. The school principal indicated that the children appeared "disheveled," that Mother did not seem particularly interested in their academic progress, and that she frequently called the school "very agitated."

Allen said that Mother discussed "conspiracy theories" that did not make sense and made other Department employees feel uncomfortable. Multiple witnesses testified about Mother's aggressiveness and volatility, and Mother posted one of the foster parents' name and phone number online, threatened that family, and called the police to ask for a welfare-check after threatening to do so if the family did not meet her demands. Mother refused to engage in services and never completed a psychological evaluation. Mother maintained that she did not need the court-ordered services; that she was not required to sign visitation rules, despite the trial court's order to the contrary; that therapy was optional, despite the trial court's order to the contrary; and that she "never did anything" to her kids. She was unable or unwilling to testify about her efforts to obtain employment or where she had lived between leaving the hotel and moving into the women's shelter.

A course of conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied) (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). Although

Mother denies making the statements, multiple witnesses testified that she expressed an inability to provide for the children on the night the children were removed. *See A.B.*, 437 S.W.3d at 503 (factfinder is sole judge of witness credibility). Throughout the proceeding, she continued to maintain an unstable life and to refuse to participate in Department services aimed at alleviating some of the safety concerns that gave rise to the removal of her children. She also refused to engage in services that could determine whether she had mental health concerns that needed to be addressed, insisting she had no such issues despite several witnesses testifying about volatile, paranoid, or aggressive behavior. The evidence is legally and factually sufficient to support the trial court's finding that Mother engaged in conduct that endangered the children's well-being. *See A.C.*, 560 S.W.3d at 630-31. We overrule Mother's first issue on appeal.[5]

As for best interest, this case began when, over a period of about seven hours, the children were left at school, transferred to the care of the police, and then moved to the

---

[5] Although we need not consider Mother's second issue, which complains of the subsection (O) finding, *see Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.), we observe that sufficient evidence supports the finding. Mother refused to sign the service plan; did not complete a psychological evaluation, engage in therapy, take a parenting class, find stable employment or a stable home, or show herself able to provide for the children; could not provide any information about attempts to find employment; and did not keep the Department informed when she moved or changed employment.

Mother argues that she should be excused from compliance under section 161.001(d), which bars termination for failure to comply if the parent proves that she was unable to comply, that she made a good-faith effort to comply, and that her failure to comply is not attributable to any fault of hers. Tex. Fam. Code § 161.001(d). However, although Davis agreed that she and Mother had a hostile relationship, Mother had the burden of showing more than that she and Davis did not get along. Instead, Mother had the burden of proving that she made good-faith efforts to comply and was not responsible for her failures to do so. *See id.* Multiple witnesses testified that Mother was volatile, paranoid, aggressive, and hostile. The Department also presented evidence that Mother was offered bus passes and given referrals but refused to engage in services, asserting she did not need them, and yet blamed the Department for not providing services or assistance. Moreover, Mother did not testify about her attempts to comply. On this record, Mother has not established that she should be excused from compliance with a court order under section 161.001(d).

20

Department's care. Father promised over several hours that he was on the way but never appeared. Mother did not return the Department's calls until about 10:30 p.m. and did not arrive until after midnight, telling the caseworkers that she wanted the Department to take custody because she was unable to care for the children. Further, Mother indicated that although she had asked Father to get the children, she had concerns that he was currently using drugs. Mother opined that it was detrimental to the children to be separated from her and from each other, but she was unemployed, living in a shelter, and vague about her plans if the children were returned to her, indicating only that the children could live with her at the shelter until she found a place to live and that they could stay at their current schools. She presented no evidence about her efforts or ability to find stable employment or a place to live.

The Department's visitation notes indicate that the children love Mother and have asked when they could go home to her. However, she refused to sign a visitation contract or engage in mental-health services, resulting in her not having visitations for more than six months. She had also refused to take a parenting class and did not engage in other offered services. She testified that the Department had refused her requests for help with utilities or deposits, but Department witnesses testified to the contrary, stating that they offered her help and that she refused it. One of the children's CASAs observed that Mother continued to be very reliant on assistance from third parties while also insisting that she did not need or want the Department's assistance.

Davis and the children's CASAs testified that the children had been placed in safe, stable homes and were bonded to their foster placements, who worked cooperatively to make sure the siblings maintained close relationships while the Department worked to reunite the children in one home. D.R. had been determined not to be autistic, O.R.'s dental issues had been

21

addressed, the children were at healthier weights. They were all doing well in school, happy in their respective homes, and receiving appropriate therapy, and their overall health had improved. The Department's witnesses and the children's co-CASAs all believed that termination was in the children's best interest, testifying that the children needed stability, that the parents had not shown an ability or willingness to provide it, and that Mother put her own needs ahead of her children's.

We have considered the evidence about the children's safety and comfort-levels in their current placements, their needs now and in the future, the possible risks posed by Mother's instability, her refusal to avail herself of services or programs that could help her, the circumstances that initiated the children's removal, her refusal to do the things necessary to obtain visitation, and her volatile moods, harassment of a foster placement, and hostility towards other people. *See C.H.*, 89 S.W.3d at 27; *Holley*, 544 S.W.2d at 371-72; *see also A.B.*, 437 S.W.3d at 503 (appellate court should not second-guess trial court's evaluation of witness credibility or resolution of conflicts in evidence). We hold that the evidence is sufficient to support the trial court's finding that termination is in the children's best interest. We overrule Mother's third issue on appeal.

## FATHER'S APPELLATE ISSUES

The trial court found that Father (1) had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being; (2) had not complied with the provisions of a court order that established the actions necessary for the parents to regain custody of the children, who were in the Department's care for at least nine months after being removed for abuse or neglect; (3) knowingly placed or allowed the children to remain in conditions or surroundings that

22

endangered their physical or emotional well-being; and (4) used a controlled substance in a manner that endangered the children and either failed to complete a court-ordered treatment program or continued to abuse the controlled substance after completing a program. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P).

Father's court-appointed attorney has filed a motion to withdraw supported by an *Anders* brief, concluding that the appeal is frivolous and without merit. *See Anders*, 386 U.S. at 744; *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam) (approving use of *Anders* procedure in appeal from termination of parental rights). The brief presents a professional evaluation of the record and demonstrates why there are no arguable grounds to be advanced. *See* 386 U.S. at 744; *Taylor v. Texas Dep't of Protective & Reg. Servs.*, 160 S.W.3d 641, 646-47 (Tex. App.—Austin 2005, pet. denied). In his pro se filings, Father asserts that he was improperly required to testify after attempting to invoke his Fifth Amendment rights, but the only information he provided was a listing of the charges for which he was incarcerated—he did not provide any detail about the circumstances underlying the charges or provide potentially incriminating information. He asks whether a suspended judgment should have been offered, but termination cases have strict statutory deadlines, regardless of a parent's incarceration. *See* Tex. Fam. Code § 263.401 (termination proceeding must be dismissed after one year unless trial court grants extension of up to 180 days). Finally, Father asserts that the Department presented evidence that was untrue or incomplete and states that he did not know Mother had mental problems and that she behaved normally during their time together. However, as noted earlier, we cannot second-guess the trial court's evaluation of witness credibility or evidentiary conflicts. *See A.B.*, 437 S.W.3d at 503.

23

We have conducted an independent review of the record, including Father's pro se filings and the *Anders* brief submitted by his attorney. *See Penson v. Ohio*, 488 U.S. 75, 80 (1988); *Taylor*, 160 S.W.3d at 647. We have found nothing in the record that might arguably support an appeal and agree with counsel that Father's appeal is frivolous and without merit.

## CONCLUSION

We have overruled Mother's issues on appeal and have found Father's pro se complaints to be without merit. Accordingly, we affirm the trial court's decree terminating Mother's and Father's parental rights. Father's counsel's motion to withdraw is denied.[6]

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:  April 14, 2021

_____

[6] The Texas Supreme Court has held that the right to counsel in suits seeking the termination of parental rights extends to "all proceedings in [the Texas Supreme Court], including the filing of a petition for review." *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam). Accordingly, counsel's obligation to L.M.V. has not yet been discharged. *See id.* If L.M.V., after consulting with counsel, desires to file a petition for review, counsel should timely file with the Texas Supreme Court "a petition for review that satisfies the standards for an *Anders* brief." *See id.* at 27-28.